THE WESTERN UNION TELEGRAPH COMPANY v. T. W.
SIMPSON, C. W. LINN, AND J. W. JENNINGS, *Part-
ners as Simpson, Linn & Jennings.*

No. 11,997.*   ( 67 Pac. 839.)

SYLLABUS BY THE COURT.

TELEGRAPH COMPANY—*Negligence—Proximate Damages—Limit
of Liability.*   A telegraph company receiving for transmission
over its lines a message agrees to transmit and deliver the same to
the sender with reasonable promptness, and is liable for such
proximate damages as may occur from its failure to do so.   It is

---

*For opinion by court of appeals, see 10 Kan. App. 473, 62 Pac.
901.—REP.

not, however, liable for damages that are not traceable to and resultant from an unreasonable delay in the transmission and delivery of such message and which would have resulted had no such delay occurred.

Error from the court of appeals, southern department; A. W. DENNISON, B. F. MILTON, and M. SCHOONOVER, judges. Opinion filed February 8, 1902. Reversed.

*George H. Fearons,* and *Rossington, Smith & Histed,* for plaintiff in error.

*Deford & Deford,* for defendants in error.

The opinion of the court was delivered by

CUNNINGHAM, J.: This was an action by Simpson, Linn & Jennings, hereinafter called Simpson, against the Western Union Telegraph Company, hereinafter called the company, to recover damages occasioned to them by the failure of the company to deliver promptly certain telegrams sent by them and in their interests.

Simpson was a cattle-dealer residing in Franklin county, Kansas. He went to Montrose, Colo., for the purpose of buying cattle, and arrived there on the evening of the 8th of March, 1896. He took with him two letters of credit, one from the Bank of Waverly for $10,000, and one from the Bank of Williamsburg for $3000. On the morning of the 9th of March he went to the First National Bank of Montrose and informed it of his mission and the probability that he would need funds with which to buy cattle, exhibited his letters of credit, and desired to know whether he could obtain the necessary funds upon the same with which to make his purchases. The bank advised that the proper course would be to deposit his letters of

credit and draw against the banks which had issued them, and that in the course of two or three days it would have the funds on deposit with its correspondent at Kansas City, so as to enable it to honor any checks which he might draw. This he declined to do, stating that he might conclude after investigation to go elsewhere to purchase and might not eventually wish to use his funds at that place. He went into the country some eighteen miles during the day and negotiated for the purchase of 140 head of cattle of the kind known as "feeders," and found that he would need about $4000 to pay for the same. Returning to Montrose that evening, he went to the First National Bank of Montrose on the morning of the 10th to make arrangements to procure the money needed for this purpose, drew his check on the Bank of Waverly for $4000, and deposited the same with the First National Bank of Montrose, which bank at the instance of Simpson wrote out a telegram, on one of the ordinary blanks of the telegraph company, which was as follows :

"MONTROSE, COLO., March 10, 1896.
" *The Bank of Waverly, Waverly, Kan.:*
"Will you pay Simpson & Jennings' check, four thousand dollars, on your credit letter March 5. Wire quick.        FIRST NATIONAL BANK."

This telegram was delivered to the company's agent at Montrose at 9:03 A. M. on the 10th of March and forwarded without delay over the wires of the company to Waverly, but was never delivered by the company's agent at Waverly. By proper diligence an answer to this telegram might have been received by noon of that day. This bunch of cattle was delivered at the stock-yards of the railroad company at Montrose about five o'clock on the evening of the 10th for ship-

ment.    During the afternoon of the 10th Simpson bought another bunch of 299 head of cattle, of the kind known as "stockers."    During the forenoon of the 11th, having received no answer to the telegram of the 10th, and needing $9000 more with which to pay for the last bunch of cattle, he again applied to the First National Bank of Montrose to procure further funds, and was advised by it to wire the banks of Waverly and Williamsburg to transfer by wire the amounts of money he had to his credit in these banks to the Midland National Bank of Kansas City, which was the correspondent of the First National Bank of Montrose, and for such funds to be there placed to the credit of the First National Bank of Montrose.    For this purpose he prepared and sent telegrams to these banks, that to the Bank of Waverly being as follows :

"MONTROSE, COLO., March 11, 1896.
"*The Bank of Waverly, Waverly, Kan.*:,
    "Transfer to Midland National Bank, Kansas City, by wire, ten thousand dollars.    Wire credit, First National Bank, Montrose.    Don't pay check four thousand dollars.    Quick.
SIMPSON, LINN & JENNINGS."

These telegrams were delivered to the company's agent at Montrose at 11 : 10 A. M.    The one to the Williamsburg bank accomplished the purpose desired, being answered to that effect at 3 : 25 P. M. on the same day ; so concerning this there is no complaint.    The one to the Bank of Waverly was not delivered until nine o'clock on the morning of the 12th.    Receiving no answer to either of the telegrams sent to the Bank of Waverly, Simpson sent another telegram at 7 : 20 P. M. on March 11, which was as follows :

" *The Bank of Waverly, Waverly, Kan.*:
    "Explain why we have no answer to our message. Here on expense account your delay.    Wire credit, quick.                          SIMPSON, LINN & JENNINGS."

This dispatch was received at Waverly the next morning and delivered at the same time the second dispatch was. Upon receipt of these telegrams by the Bank of Waverly, it replied with the following message :

"WAVERLY, KAN., March 12, 1896.
"*Simpson, Linn & Jennings, Montrose, Colo.:*

"Message received at nine to-day. Can't transfer by wire. Will wire them to wire First National Bank, Montrose. BANK OF WAVERLY."

Shortly thereafter it followed this with another message as follows :

"*To Simpson, Linn & Jennings, Montrose, Colo.:*

"After seeing Wallace, we cannot place money in Midland National, Kansas City, as requested. We wire Montrose bank we will honor your checks. BANK OF WAVERLY."

At the same time the Bank of Waverly wired the First National Bank of Montrose that it would honor Simpson, Linn & Jennings' check for $10,000.

At the close of banking hours on the 11th, it having come to the ears of the officers of the Bank of Montrose, another banking institution in that city, that Simpson was having trouble to arrange his credits, its cashier had a conference with Simpson and an arrangement was made whereby this bank guaranteed to the owners of the cattle payment therefor, and thus made it possible for Simpson to ship the cattle, and at 9 : 50 P. M. of that day he directed the railroad company to procure the necessary engines and cars with which to transport the entire bunch of cattle. This order was at once given. It would take about eight hours from the time the order was given at Montrose to get the necessary cars there from other points. The railroad officials, however, advised that instead of loading the cattle during the night it would

be better, on account of the difficulties in going over the mountains, to load and start the cattle in the morning, that a daylight trip might be had. Indeed, the agent testified that it was practically impossible to load the cattle during the night; that he had never known this to be done during a service there of six years. To this arrangement Simpson consented. The necessary trains came into Montrose about daylight on the morning of the 12th. One train was loaded and sent out, and another was about ready to move when the telegrams were received from the Waverly bank, as hereinbefore spoken of.

The stock-yards at Montrose were dry pens, the water very poor and feed scarce, so that the cattle lost in weight and condition while being kept there, and it was for this loss, with hotel expenses, extra feed and labor, as elements of damage, that Simpson brought this suit. Trial was had to a jury and a general verdict for the plaintiff was rendered and special findings made. One of these special findings was as follows :

"If you find defendant responsible for any portion of the time said cattle were delayed at Montrose, please state the number of hours for which you so hold it liable, and between what particular hours of what days.

"Ans. Thirty-four hours. Feeders, from twelve o'clock P. M., midnight, on the 10th of March, 1896, to ten o'clock A. M. on the 12th of March, 1896. Stockers, twenty hours; between noon of the 11th and noon of the 12th of March, 1896."

That there was negligence in not delivering the first telegram at all and in its failure promptly to deliver the second is conceded by the company, and it admits that plaintiff is entitled to recover at least the fees paid for the transmission of these dispatches; so that

the question presented in the case is as to how much more than this can be given to the plaintiff.

In their petition, plaintiffs count upon for their cause of action and set out in full the three telegrams sent from Montrose to the Bank of Waverly, but it is clear, and now admitted in their brief, that the failure to deliver the last one resulted in no damage to defendants in error; so the question of damages as to this dispatch may be dismissed.

The contractual obligation of a telegraph company receiving a dispatch for transmission is clear and undenied. Out of it arise the agreement to transmit correctly and deliver with reasonable promptness the message received, and the liability to pay all proper damages that may arise from its failure so to do. These damages, however, must be proximate, and not remote and speculative. They must be such as arise naturally from the breach of the contract and the probable result of such breach; so that damages resulting from other causes than the negligence of the company in transmitting or delivering may not be considered.

Thus we are led to inquire, What damages did arise from the failure of the company promptly to deliver the telegrams sent on the 10th and the first one sent on the 11th? As to that of the 10th, it is contended by the company that, inasmuch as the plan of Simpson to have his money placed at his disposal in the First National Bank of Montrose was subsequently and entirely changed, and payment of the check for $4000 was countermanded, this dispatch in effect dropped out of sight and the failure to deliver the same caused no subsequent damage. This proposition is pursued with much vigor and cogency, but we are unable to give it our entire approval. The deliv-

cry of this telegram might have brought some response at once from the Bank of Waverly, and might have enabled Simpson without delay to proceed along other lines. Had this dispatch received the prompt attention which it should have received, it may be that much of the delay would have been avoided as to this bunch of feeders. It seems to us that out of this negligence of the company may have grown substantial damage to Simpson. Had this dispatch been promptly delivered Simpson might have been able to procure, at least as early as the morning of the 11th, the necessary trains to transport this bunch and thus have avoided the delay as to them of at least twenty-four hours.

There is some evidence in the record tending to show that Simpson was not expecting or desiring to ship this bunch of cattle until he had the stockers ready to move, but we do not think there is enough to be conclusive upon that point.

Taking up the telegram that was sent about eleven o'clock of the 11th, we are well convinced that no damage resulted to Simpson from the failure of the company promptly to deliver the same, and this for two reasons :

*First.* It clearly appears from the special findings, as well as from the testimony of the cashier of the Waverly bank, that had this telegram been promptly delivered the request therein contained to transfer funds held by it for Simpson to the Midland National Bank would not have been complied with. We think, at the earliest, with reasonable promptness in handling it, a reply could not have been received from the Bank of Waverly before three o'clock P. M. The refusal to comply with the terms of this telegram would have necessitated further negotiations and delay ; so

that it is clearly apparent that no arrangement could have been made in the manner desired by the First National Bank of Montrose which would have permitted the cattle to be shipped any earlier than they were.

*Second.* Simpson had succeeded in arranging credit with the Bank of Montrose, as we have already seen, shortly after banking hours on the 11th, and had caused an order for the cars to be sent in ; so that the failure of the company promptly to deliver the telegram of the 11th caused no delay whatever in the shipment of the cattle ; indeed, it is quite probable that, by reason of the arrangement made with the Bank of Montrose, Simpson was enabled to ship them out earlier than he would have done if he had depended upon the making of the proposed arrangement through the Bank of Waverly.

Again, it seems beyond dispute that the jury in arriving at their verdict allowed damages for greater delay at Montrose than the facts of the case warrant. In their special finding quoted above, they say that the feeders were detained from twelve o'clock midnight on March 10 to ten o'clock A. M. on March 12, and the stockers from noon of the 11th to noon of the 12th. These feeders came into the yards at five o'clock on the afternoon of the 10th. It would have been possible to obtain cars for their transportation in six to ten hours after they had arrived, but there is no reason to suppose that the conditions for their loading and transportation over the mountains during the night would have been any more favorable on the night of the 10th, than on the night of the 11th, at which time, even under the stress of their delay, Simpson concluded it better not to attempt to load and start until morning ; so that as to

these feeders it seems quite certain that the start would not have been made before ten o'clock of March 11, and this diminishes the delay found by the jury to twenty-six hours, instead of thirty-four; and as to the stockers, which came into the yards about noon of the eleventh, and which could not have been paid for before three o'clock P. M. of that day had the telegram been promptly delivered and a favorable answer received from the Bank of Waverly, the delay as found by the jury is clearly erroneous.

Suppose a *favorable* reply had been received at three o'clock from the Bank of Waverly, then for the first time might the cars have been ordered; to get them there would have required from six to ten hours. The loading would presumably have been deferred on account of the difficulties in loading and going over the mountains during the night as it was; so that clearly but little if any delay was caused by the failure to deliver this message of the 11th. This consideration becomes much stronger when we remember that a favorable reply would not have been received and that additional delay would necessarily have resulted.

Plaintiffs set out in their petition all three of the telegrams sent to the Bank of Waverly as one cause of action, and alleged that, by reason of the negligence of the company in delivering the same, damage had accrued to them. An attempt was made by the defendant to have the plaintiffs separately state and number their causes of action. The motion therefor was technically insufficient, and therefore we are not able to say that the court erred in overruling the same, but the failure separately to state and number was the cause undoubtedly of much confusion in the presentation of the case to the jury on the part of both the court and counsel, and consequent perplexity on

the part of the jury.   Growing out of this confusion undoubtedly is the error committed in the admission of evidence showing the damage to the cattle by their shrinkage during the entire period of their detention in the yards at Montrose.   The plaintiffs claimed in their petition that they were delayed in the shipment of the entire 439 head from "about noon on the 11th day of March, 1896, until noon of the 12th day of March, 1896," a period of twenty-four hours, and yet the jury allowed thirty-four hours for the feeders and twenty hours for the stockers, the same being practically for the entire time the cattle were in the pens, when confessedly no small part of this delay was necessary and entirely apart from any negligence of the company, and would have occurred had the messages been promptly delivered.

We are compelled to reverse the judgment of the court of appeals and also of the district court, and remand the case to the district court for a new trial.

It will undoubtedly occur to both court and counsel that the issues involved should be made more definite and certain by omitting the irrelevant allegations, if not by separately stating and numbering.

JOHNSTON, GREENE, ELLIS, JJ., concurring.