BOATMEN'S BANK v. TROWER BROS. CO.

(Circuit Court, W. D. Missouri, W. D. July 19, 1909.)

No. 2,722.

1. REFERENCE (§§ 24, 100, 101, 106*)—PRACTICE IN FEDERAL COURTS—CONSENT OF PARTIES—REPORT AND FINDINGS OF REFEREE.

It is a recognized practice in the federal courts to make a reference in law actions by consent of the parties, when either party may file objections to the referee's report, and the court may make a re-reference for further findings or enter judgment on the record, in which case, while it will be strongly inclined to follow the findings of the referee upon the facts, it is not bound to do so either as to the facts or law.

[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 157–180, 206; Dec. Dig. §§ 24, 100, 101, 106.*]

2. ESTOPPEL (§ 94*)—ACTS CREATING EQUITABLE ESTOPPEL—ASSENT TO MORTGAGE OF PROPERTY BY ANOTHER.

One representing that he had purchased certain cattle went in company with the seller and obtained a loan from defendants, giving a chattel mortgage on the cattle as security. The mortgage recited the sale, and the seller signed the note as surety and received the benefit of the proceeds in paying off a prior note and mortgage given by him. Held that, as against defendant, neither he nor his privies could thereafter assert

title to the cattle, nor could he by any subsequent act affect defendant's rights under his mortgage.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 245, 247, 276–284; Dec. Dig. § 94.*]

3. EVIDENCE (§ 271*)—COMPETENCY—STATEMENTS BY AGENT AS AGAINST ADVERSE PARTY.

In an action between two mortgagees of the same property, each claiming priority of lien, statements made by an agent of one in a report to his principal are not evidence admissible against the other.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1087; Dec. Dig. § 271.*]

4. CHATTEL MORTGAGES (§ 178*)—ACTION BETWEEN MORTGAGEES—ACTION—BURDEN OF PROOF.

In an action of trover brought by a chattel mortgagee against one claiming under a prior mortgage, given by another, where the general issue is pleaded, the burden rests on the plaintiff to prove not only that the property was within his mortgage, but also that it was owned by the mortgagor when such mortgage was made before defendant can be required to prove his own title.

[Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 178.*]

5. CHATTEL MORTGAGES (§ 178*)—VALIDITY—IMPEACHMENT OF MORTGAGOR'S TITLE.

Defendant took a chattel mortgage on certain cattle to secure a loan of money which was used to pay off a prior mortgage given by one from whom the mortgagor claimed to have purchased the cattle; the mortgage reciting that the cattle were so purchased. The former owner was present and assisted in negotiating the loan and signed the note as surety. The mortgage was duly recorded. Subsequently such former owner gave a mortgage to plaintiff covering a larger number of cattle, and containing a general description claimed by plaintiff to include the cattle mortgaged to defendant. Such cattle having been shipped to defendant by its mortgagee and sold, plaintiff sued for their conversion. Held, that the evidence was insufficient to sustain the burden of proof resting on plaintiff to impeach the validity of defendant's mortgage or the title of its mortgagor.

[Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 178.*]

At Law. On report of referee and objections thereto.

Botsford, Deatherage, Young & Creason, for plaintiff.
J. C. Petherbridge, for defendant.

PHILIPS, District Judge. This is an action in trover, based upon a chattel mortgage on about 1,500 head of cattle in Chase and Morris counties, Kan., executed by Sam Harrison to the plaintiff on June 21, 1901. Trial by jury was waived, and afterwards, by consent of parties, the court referred the case to Willard P. Hall, Esq., "to take the evidence, make findings of fact, and adopt conclusions of law," and to report to the court by a given time. The referee having made report, recommending judgment on the second count of the petition for $2,277.10, and on the third count for $4,183.57 (the first count having been dismissed), the defendant filed written objections thereto, based on the insufficiency of the evidence, and questions of law.

While the federal statute makes no provision for such reference in a law action, it is a recognized practice in the federal jurisdiction to make such reference by consent of parties; and, after the coming in

of the referee's report, before. judgment is entered upon the findings, either party may interpose objections thereto in writing, and the court may, upon request of either party, re-refer the matter for further findings, or proceed to verdict and judgment on the record as the evidence and the law may direct. Hecker v. Fowler, 2 Wall. 123–129, 17 L. Ed. 759; St. L. Elec. Light & P. Co. v. Edison, etc. (C. C.) 64 Fed. 997–1004.

As in allied proceedings, the courts strongly incline in favor of the findings of the chosen arbiter of the parties on questions of fact. It inheres, however, in courts of justice, to see that no rank injustice be done, and they may, upon objection timely taken, so far examine into the conclusion of the referee as to see if he has erred in matters of law in any material respect, whereby his conclusions on disputed facts were influenced, and determine whether or not there be sufficient evidence to warrant his conclusions.

In the very outset of this discussion it is apparent that the referee gave too little consideration to the important fact that the defendant must be regarded throughout as an innocent purchaser for value. Its claim to the cattle in question was and is based upon a chattel mortgage executed to it by A. C. Harrison, of date January 4, 1901, more than five months prior to the mortgage under which the plaintiff claims title. In so far as the defendant is concerned, there is not an atom of tangible evidence to impeach the integrity of its mortgage. That it advanced the $7,000, and more, consideration expressed in · the mortgage, does not admit of doubt. Equally unquestionable is it that the money thus loaned by the defendant went to an anterior mortgage made by Sam Harrison in favor of Elmore-Cooper on the same cattle. The referee indicates in his report a suspicion, if not an impression, that the claim of A. C. Harrison that he had bought the cattle in question from Sam Harrison was feigned, and that in fact the cattle remained the property of Sam Harrison. If this were material, I fail to find any tangible, reliable evidence to support it. The claim of A. C. Harrison at the time of making the mortgage was: That he had bought the cattle from Sam Harrison, who was his cousin; that while he had been working for Sam Harrison, and possessed but small means, he made the venture upon an experiment to see if he could not, by the care and feeding of cattle, make a profit for himself as an independent dealer. He was the head of a family about to enter upon a rented farm to operate for himself. I fail to perceive anything either unusual or unnatural in such a transaction, and a most conclusive answer to the suggestion of the referee is that Sam Harrison was present assisting A. C. Harrison in effecting the loan of the money from the defendant, that he signed the note to the defendant as surety for A. C. Harrison, was present when the mortgage was made, which recited on its face that Sam Harrison had sold the cattle to A. C. Harrison, and the money obtained on this mortgage, as already stated, went to the benefit of Sam Harrison on his debt to Elmore-Cooper. These facts created an effectual estoppel against any assertion of title or interest in the cattle by Sam Harrison and his privies. No subsequent act or statement by him to the contrary could in any wise or degree impress or affect the title, rights, or

interest of the defendant under its said mortgage, "or alter the condition of the estate conveyed to the injury of the mortgagee." McShane v. City of Moberly, 79 Mo., loc. cit. 43. The referee in his report attaches material importance to the fact that, in the mortgage made five months subsequently to the defendant's mortgage, Sam Harrison gave descriptive terms to the cattle mortgaged by him to the plaintiff sufficiently comprehensive to cover the cattle under the defendant's mortgage. This entirely ignores the attitude and rights of the defendant as an innocent purchaser for value, both as against A. C. Harrison and Sam Harrison.

Again the referee fell into a hurtful error of law by admitting in evidence the report made by one Kelly, who was sent out by the plaintiff's agent and representative to examine the cattle, in which report it is claimed he gave description of the cattle and their location. This was objected to by the defendant's counsel, and is sufficiently embraced within the sixth exception taken by the defendant to the report. It is stated that Kelly has since died. But how does that fact render his report made to Pinnell, plaintiff's agent, competent evidence against the defendant in these lawsuits. Kelly was not the agent of the defendant, nor was his report made to it, nor in their hearing, nor did it ever assent to its truth. It was the unsworn, ex parte statement made in pais to the plaintiff's agent. It was as much mere hearsay testimony as if the statement had been made by Kelly, ore tenus, to the plaintiff's agent, and the latter had undertaken on the trial of this case to narrate what Kelly said to him. This evidence was clearly inadmissible. Nevada Co. v. Farnsworth, 102 Fed. 573, 42 C. C. A. 504; Lemon v. U. S. (C. C. A.) 164 Fed. 953; Sorenson v. U. S. (C. C. A.) 168 Fed. 785. On that report the referee predicated material findings of fact as to the quantity, description, and locality of the cattle mortgaged by Sam Harrison to the plaintiff. That mortgage purported to cover 1,500 head of cattle located in Chase and Morris counties, Kan., and was drawn with such varying, adjustable, and comprehensive descriptions as would cover nearly all ages and sexes of cattle, with or without minute description in the mortgage. As Sam Harrison by no statement made in his mortgage to the plaintiff could in any wise affect the rights of the defendant under its anterior mortgage from A. C. Harrison, the only evidence, aliunde, respecting the number, description, and location of cattle, was the testimony of the witnesses Reeves and Smalley mentioned in the report. Reeves was a hired man under Sam Harrison, who went to work for him the last of February, 1901, and remained until the 20th of November, 1901. He was not there when the mortgage of A. C. Harrison to the defendant was made, and hence knew nothing about the then location of the cattle. He testified that there were 96 head on Sam Harrison's premises when he went there. On the 10th day of April 110 head of cows and heifers were brought there from Marion county, and on the 25th of April 210 head of steers from Marion county, dehorned, and on May 1st 103 head, making in all 519 head of cattle; and in a general way his testimony was that there were about 1,000 head of cattle on the different places while he was there. The witness

Smalley says there were about 700 head of cattle on hand in May, 1901.

The answer of the defendant to the second and third counts tenders the general issue. The burden of proof rested on the plaintiff, and did not shift in the course of the trial, until the proposition of fact affirmed became established, in such sense that it ceased to be controverted upon the record, so that it becomes established as a conclusion of law. Bunker v. Hibler, 49 Mo. App. 537; Schaefer v. St. Louis & S. R. Co., 128 Mo. 64, 30 S. W. 331. This burden is fixed "by the nature of the allegations of the pleading, and it is settled as a question of law and does not change during the course of the trial," until the plaintiff has presented a prima facie case, and the defendant, "instead of producing proofs to negative the same fact, proposes to show another and distinct proposition, which avoids the effect of it." Nichols v. Winfrey, 79 Mo., loc. cit. 550.

As the plaintiff propounded right and title under a chattel mortgage from Sam Harrison, it was not sufficient for it to prove simply that the cattle which came within the comprehensive description of its mortgage corresponded with the cattle alleged to have been converted by the defendant. Its proof must go further and show that, at the time of making the mortgage, Sam Harrison was the owner of the cattle in question, as under the general issue the defendant could present any evidence to show that Sam Harrison at the time of the plaintiff's mortgage did not own the cattle. Such evidence would defeat the action. Greenway v. James, 34 Mo. 326–328. The burden did not shift to the defendant by introducing evidence tending to show that Sam Harrison hitherto parted with his interest in the cattle to A. C. Harrison, who, with Sam Harrison's assent, mortgaged them to the defendant.

The mortgage of A. C. Harrison to the defendant by force of its recitation, in so far as the defendant is concerned, stands as a bill of sale from Sam Harrison to A. C. Harrison. That mortgage, after giving the description of 180 native and western steers, 3's, most all dehorned, some branded S-Y, balance H on right hip, 102 native and western cows, 3's to 5's, some branded S-Y, but most branded H on right hip, added the following:

"All of the above cattle are the same cattle that were held under mortgage by Elmore-Cooper Live Stock Commission Company, dated March 8, 1900, executed by Sam Harrison of Latimer, Kan., but have been sold to party of the first part by said S. Harrison, and the aforesaid mortgage has been fully satisfied and released. The above-mentioned cattle are to be kept separate from any of the cattle now owned by party of the first part. All of the above cattle have been delivered to party of first part and located as described, with the exception of 62 head of the cows, and they will be delivered within 10 days. The same being now located and to be located on farm owned by Mrs. M. H. Hewitt 2½ miles East of Elk, Chase county, Kan."

The existence of the Elmore-Cooper mortgage is conceded. It was not attempted to be shown by evidence that no cattle were mortgaged to Elmore-Cooper. It is true that the Elmore-Cooper mortgage stated the cattle, when it was given the year before, were in Sam Harrison's pasture in Morris county, 1½ miles southwest of Latimer, Kan.; but why attach any importance to this latter situs, when the

evidence shows, as is nearly always the case with herds of cattle, that Sam Harrison was a cattle dealer of vast proportions, whose holding of farms, pastures, and ranches extended into three counties, cornering on each other, and that the cattle were constantly shifting from place to place for feeding and pasturage. So if the Elmore-Cooper cattle were in Morris county in 1900, was it incumbent on the defendants, as the referee seems to suggest, to show affirmatively how and when they got into Chase county? The mortgage to the defendant, made in the presence and under the claimed direction of Sam Harrison, stated that the cattle were in Chase county at the Hewitt place, except 62 head of cows which were to be delivered within 10 days, which A. C. Harrison directly testified were so delivered. The reasonable and natural inference is that the cattle, or at least 282 head of steers and cows covered by the Elmore-Cooper mortgage, were at the time of the taking of defendant's mortgage in Chase county.

By a most critical analysis of comparison, the referee undertakes to show discrepancies between other descriptive parts of the Elmore-Cooper and the A. C. Harrison mortgages. The former called for 325 head of cattle, while the defendant's called for 282. The words, "all of the above cattle are the same cattle that were held under mortgage by Elmore-Cooper," do not necessarily imply that it embraced all of the cattle under the Elmore-Cooper mortgage. Its reasonable meaning is that the 282 head of cattle were the same held under the Elmore-Cooper mortgage. The difference as to number might well have resulted from deaths, straying, or other causes. The defendant's mortgage covered 282 head then on the Hewitt place in Chase county, except the 62 head which were soon to be there delivered. If those cattle were under the Elmore-Cooper mortgage, the defendant had a right to demand and hold them if delivered to A. C. Harrison.

It is conceded that the description of 102 cows in the mortgage of A. C. Harrison to the defendant is practically the same as in the Elmore-Cooper mortgage. In the latter there were 77 western cows coming 3's and up, and 25 native Kansas cows full age. The description in the former comprehends all cows 3 years to 5 years. This would embrace cows of full age as well as those that were 3 years and up. In the Elmore-Cooper mortgage 110 native steers were described as coming 4's, which, according to the referee's finding, would make them 3 years old in March, 1900, and, according to his finding, they would still be 3 years old in January, 1901, when the defendant's mortgage was taken. Seventy-five native steers and 38 western steers in the Elmore-Cooper mortgage were described as coming 3's, which, according to the reasoning of the referee, would make them 3's in March, 1901, so that it is quite apparent how in the defendant's mortgage the whole was classified as 180 native and western steers 3's; the mortgage being given nearly a year later. But it does seem to me that such technical refinement is too abstract in the administration of simple justice. As already stated, the mortgage shows on its face that it was intended to cover 180 head of the cattle, steers, and cows which were under the Elmore-Cooper mortgage, as well as the increase from the cows, stating that all of the above cattle had been and would be delivered by Sam Harrison to A. C.

Harrison, and giving the farm where they were located. The very purpose of this recitation manifestly was to obviate any possible discrepancy or variation in the mere matter as to whether the cattle were 3's in March, 1900, or 3's in January, 1901.

I am unable to find any evidence in this record to warrant even a suspicion that the cattle mortgaged to the defendant were not on the Hewitt place in Chase county. A. C. Harrison testified affirmatively to this fact. No witness' contradicted him. The owner of the cattle, just prior to the making of the mortgage, in effect asserted by the recitations in the mortgage that these cattle were then on the Hewitt farm, except 62, which were soon to be delivered, and A. C. Harrison testified that the latter were so delivered. A. C. Harrison testified that he took charge of the cattle, cared for, and fed them on that place until the latter part of February following, when he moved them to the Krueger farm in Marion county, where they remained until put on grass; that they were then taken to the pasture near Latimer, the steers on what was known as a section pasture, and the cows were on a pasture north of Latimer. All of them except 30 head were on the Burke farm. While the Burke farm had been leased by Sam Harrison, A. C. Harrison moved onto it with his family about the 1st of March, 1901, and so remained there until March, 1902, farming it, pasturing, and feeding cattle there. There is not a particle of tangible testimony to contradict this testimony. The witnesses Reeves and Smalley, mentioned in the referee's report, upon whom the plaintiff has to rest for nearly everything descriptive of and the location of the cattle, did not work on the Burke farm, and knew nothing about the arrangement between Sam Harrison and A. C. Harrison. They baldly assumed that everything in that country belonged to Sam Harrison. A. C. Harrison further testified that a bunch of the cows were at the Burke farm all summer, excepting two weeks. Thirty cows were there all the time during the two weeks. They were in the pasture north of Latimer. One hundred and seventy head of steers were brought to the Burke pasture, and 146 steers he testified were taken to the Wing pasture for the balance of the season, which was a little late for the pasture season. A. C. Harrison is corroborated in material respects by other witnesses. Burke testified that there were no other cattle on his place than those A. C. Harrison had there branded H, about 175 head, which he thought were 2's and 3's. The plaintiff's witness Reeves testified that cattle were taken to the Burke place in May. He did not know who took them. Mrs. A. C. Harrison testified that she remembered her husband buying a bunch of cattle from Sam Harrison and making a chattel mortgage thereon; that they were delivered at the Hewitt ranch in Chase county, and were fed and taken care of by her husband; that they were moved from the Hewitt place to the Burke place, which was run exclusively by her husband; and that she saw the cattle often as they were in the pasture close to the house. A. C. Harrison is further corroborated by the testimony of Mr. Wing, to whose pasture steers were moved from the Burke place.

The testimony of Mr. Wing in this connection is important and most persuasive. It is of no consequence in this issue between the

plaintiff and the defendant whether or not Sam Harrison made the arrangement with Wing for pasturing the cattle claimed by A. C. Harrison. Wing's evidence tends to show that A. C. Harrison gave his check for the pasturage of the cattle, and he thinks Sam Harrison signed the check with him. The testimony of A. C. Harrison, without contradiction, is that Sam Harrison was to furnish this pasture, and he was to pay for it out of the cattle. Be that as it may, A. C. Harrison drove from the Burke place 146 steers and turned them into Wing's pasture, a memorandum of which was contemporaneously made by Wing in his pocket memorandum book. Another most important identifying fact is developed by the testimony of Wing, and that is that these cattle were first taken to the stock yards, where the brushes were cut from their tails in order to identify them from other cattle then in his pasture, and those cattle were taken from Wing's in the fall to the Burke place. The plaintiff's own witnesses testified that the last shipment of cattle came from the Burke place, and the evidence also shows that there were other cattle at the Burke place not taken to the Wing pasture. It is true that the evidence tends to show that some of the cows in question were taken to the Gist place, one of Sam Harrison's feeding lots, and were taken from there when shipped to the defendant. There is no ground for the contention that all the cattle, with the exception of one derelict shipped in October and December to the defendant, did not bear the brand given in the mortgage of A. C. Harrison to the defendant.

It is perfectly clear to my mind that the man Kelly sent out there by Pinnell in June, 1901, never saw the cattle that were at the Burke place or at the Wing place. The witness Smalley testified that he saw Kelly out at Sam Harrison's riding around with him in the pasture, but even he does not state that Kelly visited the Burke place, and A. C. Harrison testified directly that Kelly was not at his place on that visit.

The witness Smalley, so much relied on by the plaintiff, the evidence shows, had been sent to the insane asylum four times prior to his taking service under Sam Harrison, and since the departure of Sam Harrison, in November, 1901, and during the litigations had by the plaintiff bank with other parties out in Kansas and with this defendant, he has been in the employ of the plaintiff, assisting it in the matter of his services and evidence; but, giving to this witness the fullest credence, I perceive nothing in his testimony that should make it the predicate of a finding of the issues for the plaintiff. The fact that the Harrisons did not confide to this hired man their arrangements respecting the transaction of the sale and the mortgage of the cattle in question is not worthy of consideration. He admits in his testimony that 170 head of cattle were driven to the Burke farm, where A. C. Harrison lived, in June, and the taking of cattle to the Wing pasture, and then some of them were taken to the Gist place, and it is quite clear that the 69 head of cattle shipped in September, 1901 (concerning which, it is suggested that it was a recognition or concession by A. C. Harrison and the defendant that the plaintiff's mortgage covered at least part of the cattle claimed by

defendant under the mortgage), were evidently not embraced in the defendant's mortgage because they are represented as 2's past, and they bore only the brand T.

Neither is there anything in the testimony of the man Reeves to impeach or impair the mass of evidence in behalf of the defendant's claim. Evidently he tried to be superserviceable to the plaintiff when he testified that the 69 head of steers shipped October 20, 1901, on which the second count of the petition is based, were 2's, coming 3's. The petition itself alleges that the 69 steers were 3 years old. If his testimony therefore in this respect were accepted, the plaintiff would be plagued with a material variance. As illustrative of the lack of breath in the testimony of this witness touching A. C. Harrison's control of the Burke place, when interrogated as to how he knew Sam Harrison had the Burke pasture, his answers were:

"He rented that place from Burke, and he was going to move me onto it, and then him and A. C. Harrison got into a deal and he moved A. C. there.

"Q. How do you know but what A. C. moved himself there? A. Well, he had A. C. there.

"Q. Did you do any work on that place that summer? A. No, sir.

"Q. Didn't attend to any cattle on that place that summer? A. No, sir.

"Q. Had nothing to do with it, did you? A. No, sir.

"Q. Then how do you know that Mr. Harrison controlled that place that summer? A. Well he had cattle there.

"Q. How do you know he had cattle there? A. He took them there.

"Q. Who took them there, did you help drive them? A. No, sir. Well he went over there with the cattle, and I went over and helped fetch them back from there.

"Q. When was that? A. In December.

"Q. Mr. Harrison wasn't in the country there in December, was he? A. No, sir.

"Q. How did you come to drive them back in December? A. Mr. A. C. Harrison came over on the 2d day of December, and he says: 'I have got a demand for 111 head of steers and 102 head of cows for Trower Bros. to be shipped,' and he says, 'Will you help take them down to the station?'

"Q. How did you come to drive the cattle away from this Burke place in December, 1901? A. A. C. Harrison told me to go down there to the Bill Burke place with him and get 111 head of steers.

"Q. And you went there? A. Yes, sir.

"Q. And that is all there was to it? A. Yes, sir.

"Q. How did you know that those were Mr. Harrison's cattle? A. They had Sam Harrison's brand on them.

"Q. That is all you know about it, isn't it? A. Yes, sir."

So it is perfectly clear that the 111 steers and 102 cows shipped in December, covered by the third count of the petition, came from the Burke place. And, again, the witness Reeves, in order to help, as he supposed, the plaintiff's cause, testified that these last cattle were 2's and 3's, while the petition alleges that the steers were 3 years old, and nothing is alleged about the ages of the cows. There is no evidence that the cattle shipped by Sam Harrison in September came from the Burke place, and there is not a word of evidence to show that prior to September, 1901, either Sam or A. C. Harrison sold any of the cattle mortgaged.

This record fails to bear any evidence whatever of bad faith or concealment by the defendant respecting the A. C. Harrison mortgage. It was promptly placed on record in Chase county, Kan.,

where the cattle at the time were located, and out of abundance of caution is was afterwards recorded in Morris county, where the Burke farm is located. Under the Kansas statute (Gen. St. 1901, §§ 4510, 4511), the mortgagee under chattel mortgage has the alternative of filing his mortgage in the county where the property was then situated, or in the county where the mortgagor resides. See Bank v. Bond, 64 Kan. 346, 67 Pac. 818. On the filing of the mortgage in the proper county, the Supreme Court of Kansas, in Brown v. Campbell, 44 Kan. 237, 24 Pac. 492, 21 Am. St. Rep. 274, held that it is notice to all the world. And that lien followed the cattle wherever they may be removed. Superadded to all this, there is not room for reasonable doubt that Pinnell, the acting agent for the plaintiff in taking the mortgage from Sam Harrison, had notice of the mortgage in question. O. B. Trower testified directly that, at the time he and Mr. Pinnell had under discussion the taking up by the plaintiff of the blanket mortgage held by the defendant on all of the cattle of Sam Harrison, he distinctly stated to Pinnell the fact that Sam Harrison was surety on the note of A. C. Harrison to it, and that he showed him the chattel mortgage given it by A. C. Harrison. Mr. Pinnell, when recalled as a witness to testify in respect of this matter, with an air of autocratic assumption, waived the matter off as of no consequence, on the ground that he was not concerned about A. C. Harrison's mortgage. He would not deny that he saw it, or that he was told about Harrison being a surety on said notes; but in a general way he understood that he was to get a mortgage on all of Sam Harrison's cattle. This was either an evasion, or a failure to contradict the positive testimony of Trower. Aside from all this, Trower was under no obligation to inform Pinnell anything about the independent mortgage from A. C. Harrison. Speaking of a not dissimilar matter in McShane v. City of Moberly, 79 Mo., loc. cit. 45, the court said:

"The mortgagee was not guilty of any concealment. His mortgage was on record, and this fact the law of the statute declares the defendant shall be presumed to know. * * * If a man holds title to his land by deed, which has been duly recorded, it is all the notice he is bound to give so long as he remains passive."

After notice that Sam Harrison was on the notes of A. C. Harrison to the defendant, and after notice of the chattel mortgage on the cattle in that locality, responsibility, both in law and morals, rested upon the plaintiff to see to it that he did not interfere with the cattle of the defendant. I know of no law that would suffer the later mortgagee to claim all the cattle under an omnium gatherum descriptive clause in his mortgage to take any and all cattle found, on the ground that the cattle of an independent mortgagee from a different mortgagor may have possibly become mixed up with cattle included in the second mortgage without any fault of the first mortgagee; and, when such later mortgagee comes to claim such disputed cattle, the burden is upon him to show that they are his, and not those of the unoffending first mortgagee; and where, as in this case, the evidence leaves the fact in extreme doubt, that doubt should be resolved in favor of the first bona fide mortgagee. It was

as much the duty of Sam Harrison and his mortgagee, the plaintiff, to see that its cattle did not become mixed up with those of the first mortgagee, as it was of the latter; and, if both were in fault in this respect, the burden remained with the plaintiff to show to the common understanding that the title it asserts is clear. This the plaintiff has not done.

A. C. Harrison shipped to the defendant no more cattle than his mortgage called for, which he testified were the identical cattle he got from Sam Harrison, and this is supplemented by the testimony of O. B. Trower that he sent an inspector out to see the cattle, perhaps the following spring or summer, and that in October, 1901, he took with him a copy of the mortgage and went out and inspected the cattle and identified them as corresponding with the mortgage. That was before any controversy arose respecting the existence of the identity of the cattle, and he testified that the cattle which he so identified were the same cattle afterwards shipped to the defendant by A. C. Harrison.

I am so profoundly impressed with the conviction that injustice has been done the defendant, both on the facts and the law of the case, that I am unwilling to enter up judgment as recommended by the referee. If this special verdict had been returned by a jury, I would feel compelled to set it aside on the ground of failure of proof sufficient on the part of the plaintiff to sustain it.

On the indisputable facts, the exceptions to the referee's report must be sustained, and judgment go that the plaintiff take nothing by its petition.